Our numbers 24-13550 and 25-11000. Israel Roque-Hernandez and Rafaela Moreno-Perez v. the Attorney General. Mr. Urenda. May it please the Court, Robert Urenda for the petitioners. Petitioners ask for remand because the board utilized the wrong timing point for Kevin and then failed to conduct the full aggregate hardship analysis that was required. And even if the court disagrees on the timing issue, the hardship record concerning Israel Jr. independently warrants remand either because the accepted facts support the hardship standard under substantial evidence review or because the agency failed to consider a crucial theory concerning autism plus Spanish language access. Can I ask you a question about Kevin? Yes, Your Honor. I understand your argument about the BIA purportedly erring by failing to consider his situation because he had But I looked at the record and I don't see anything alleged or claimed with regards to Kevin that's different than any of the other petitioners. And so why let's assume that the BIA erred and should have considered Kevin because of delay in proceedings. Let's assume that. Why does it make a difference that it didn't consider Kevin when the evidence relating to him as I see it was the same as relating to Israel and everybody else? It's not harmless error, Your Honor, because hardship must be evaluated cumulatively in the aggregate and the court in this case wouldn't know whether the same result would have happened had they done the missing aggregate analysis itself. I guess said differently, in order to, the court need not find that Kevin would tip the scale so to say, but the board never placed him on the scale in the first place. Can I ask you a question about the timing issue, I guess the merits of the timing issue? Yes, Your Honor. Who is the Attorney General for purposes of B sub 1? It says the Attorney General may cancel removal if 1, 2, 3, 4. Who is the Attorney General? Is it the IJ, the BIA, both? The IJ and the BIA act as the delegate, I guess, for the Attorney General. So if that's true and the ultimate determination about canceling removal, why isn't the relevant time the time of the BIA's decision? Yes, this court's decision in Diaz-Arellano, I understand that it dealt with a different factual scenario. In that case, the court's language was very contemporaneously centric to the IJ's adjudication as the fact finder, as the person that is receiving the evidence and considering the evidence. In terms of the board, they have clear error review of factual findings, but they're not conducting a new evidentiary hearing when they're issuing a decision. Yes, yeah, I guess I get that, and frankly, just to pull the curtain all the way back, I mean, frankly, when I first started thinking about the case, that's exactly what I thought, and I thought, frankly, that on your side of the statutory ledger, the word establishes seems to me to point to, like, the evidentiary phase of the case. But I was convinced by one of my brilliant law clerks that there's another way of looking at it, that if the Attorney General is the one ultimately making the determination, then it may be that even if the alien can establish at the evidentiary phase that there would be, you know, sort of extreme unusual hardship by virtue of, you know, to the child, then even if that evidentiary establishment has been made, then if the child ages out by the time that the Attorney General still has the case under submission to BIA, then the Attorney General can still, and I mean, it's a matter of just chronology and calendar and judicial notice or whatever, that this is no longer a child. So why isn't that still under the Attorney General's purview? The Attorney General could also, in a situation, intend to grant a case or intend to maintain a grant from an IJ, but the time runs out and then that ability to grant is then relinquished from them. I would say, I think as it relates to finality, I know that there's the other statute, there's 1101A47, you know, and that explains when a removal order becomes final for purposes of judicial review and for DHS's ability to execute the order, but it doesn't explain when 1229BB1D would measure whether the applicant has the qualifying child for the analysis. And neither explains that every eligibility fact for cancellation must be remeasured at the board's date. I look at those two statutes and they don't cite each other, they're separate provisions, they're doing separate work, and then also within 1229B, you have subparagraphs B1A and B1B, which have temporal anchors. They talk about for a continuous period of not less than 10 years immediately preceding the date of such application, B just latches on to that and it says that during such period. Subsection B1D, the focus of this case, doesn't have restrictive temporal language. I guess I'm not sure how that favors you. I guess I would tend to think that that might disfavor your position because I totally agree with you that B1A and B1B, it seemed to me fundamentally to like tether the determination to the time of the application, right? And so Diaz has moved on from that. We know that's not the rule for D. Diaz dealt with the question whether, well, do we look at the time of the IJ's determination, and at the very least said with respect to that, yes, we can go that far. But if D is untethered to a specific, like, point in time and space in history or whatever, then why wouldn't it just be when the Attorney General can make the determination? And that seems like now. I guess I would frame that with perhaps how the agency has treated continuing applications in these temporal qualifications in the past. Generally speaking, it's saying that the eligibility is not locked at the beginning of the case. And so, like, there were cases where DHS would serve an NTA and then a qualifying relative would come to B, and then the initial position was, oh, well, the qualifying relative wasn't in existence at the time, and so we're going to be able to consider them. But in every situation where that's occurred, in anything that's tied to some sort of retrospective look back, it was involving kind of later acquired eligibility, and it also was used doctrinally as kind of like a shield for applicants to maintain eligibility, not kind of as a sword to take it away. The newest case that was, the government was issued by the 28J, there's the matter of Arvalo Vargas that came out, and their analysis as to why the petitioner would age out was just simply a parenthetical general citation to the Isidro case. It doesn't grapple with D on this, the Perez-Perez case from the Sixth Circuit, and then the Rangel-Fuentes case from the 10th. On the merit, tell me how you prevail, or you think you prevail, given our decision in Lopez-Martinez in regards to hardship. Lopez-Martinez has an important footnote, I think it's footnote 11, and it talks about how the idea of reasonableness isn't inherently a purely factual matter, and if it functions as a mechanism to contest the applicability of the hardship standard, then it is reviewed for substantial evidence. We would say in this case, while the agency talked about general factors, they didn't necessarily explain how Israel's needs in this case would particularly be likely satisfied. It kind of talks, generally speaking, about the availability of autism-based care. The IJ credited as credible the seven-hour round-trip that would be entailed to obtain such care at the same level he receives today, and the court didn't really explain why, despite that long distance, that that would still be likely satisfied, that his autistic needs would likely be satisfied. And neither the BIA nor the IJ mentioned Israel's inability to read, speak, or write the Spanish language. That is correct, Your Honor. That they're required to in all circumstances, but there's no mention of that evidence in either order. Correct, Your Honor. I would point to also matter of Racines, which is a board case when the initial hardship standard came out in 2002, and that was a case that involved four qualifying relative children and a single mother, but a huge part of that case was emphasizing the fact that the children had no comprehension of the Spanish language. This also, the Spanish point, I think, is compounded in this case, because we have an autistic child that has communication developmental issues and requires assistance in school. He can speak hello in Spanish and basic words, and the IJ credited the credible testimony as to that. So can I ask you, it seems to me there are sort of two aspects in which Lopez Martinez might be relevant. One of them, I think Lopez Martinez probably just forecloses your like wrong legal standard argument, right? In terms of imprecise word choice, yes. Okay. We can see that. But sort of on the more granular issue, the one that you've been discussing with Judge Jordan about substantial evidence, okay, so we know that's the standard and now sort of is there substantial evidence to support this finding. On the Spanish language thing, I agree that the immigration courts didn't sort of mention that specifically, but did they mention sort of enough things in and around it so as to have enveloped it for purposes of substantial evidence? So, for instance, the government says, look, yeah, they didn't mention Spanish proficiency specifically, but they did mention communications issues, special ed needs, and then emotional hardship, which I recall the parents had attributed in part to his limited Spanish proficiency. So are those, is that like a triangulation, a sufficient triangulation of Spanish proficiency for substantial evidence purposes? Had the agency indicated that there was some sort of mechanism that Spanish instruction would occur in these environments, then perhaps you could say, well, they did consider it. But the government's own brief, I think in a footnote, they acknowledge that the word Spanish isn't in either decision, and then they say presumably Spanish instruction would be part of these options that Israel would have. So they're trying to gap fill what the agency ignored in many instances. But we also agree, this is not a magic words problem. I'm not saying simply because it's reasonably available. We understand that that alone is not cognizable any further. I would just point to the case, this is a kind of a developing issue, it seems. There were two cases that postdated Diaz-Oriano. I understand there is Pina, and I understand that's an unpublished case, but I think just to distinguish Pina, we have the utilization of one phrase in Diaz-Oriano to the exclusion of every other phrase that talks about the contemporaneous evidentiary adjudication by the IJ. And I believe my time is up. You can finish that thought. Just that it focused on final order in lieu of every other instance that tied everything back to the IJ as the adjudicator, the IJ as receiving the evidence, and making a hardship determination as the conditions on the ground at that specific time. Thank you. All right, thank you very much. Good morning, Your Honors. May it please the Court, genuinely on behalf of the the Attorney General of the United States. First, I'd like to address the Spanish language issue in this case, which government conceded was not discussed by the Board or the immigration judge. But we have to look at what was presented to the immigration judge in the in the cancellation of removal application. In their closing argument, petitioner stated on the record on page 217, we've also responded, testified the fact that the children, the child, because of his condition, may be subject to bullying. And we especially because he doesn't speak Spanish, and also because of his condition. That was the only thing that was presented with regard to the Spanish language as to what the issue the immigration judge should consider. That, along with the fact that the petitioners at, Mr. Hernandez at AR 166 and 167, stated that he, that both petitioners communicated with Israel in the Spanish language, that he sometimes understands them, and that they have a rudimentary understanding of the Spanish language, is sufficient to show that... When you say they, who were you talking about? The petitioners. Parents? The parents, yes. But not the children? Oh, I'm sorry. When I said they, and when I was quoting, I meant the children. Sorry, I apologize. So the petitioners specifically stated that the children do understand Spanish, including Israel. And then along with the fact in the closing argument, they did not make Spanish to be the big issue that they're making now. So given that, and the fact that the immigration judge clearly stated that she considered all the evidence individually and cumulatively, and the affirmed that, saying that the immigration judge considered all the evidence, as Judge Newsom said, the triangulation is that we have enough in this record to show that the agency heard and thought through the evidence, and not just merely reacted. But, I mean, I take your point, and I know that we're reviewing for substantial evidence, which is sort of a relaxed standard, but a petitioner's closing argument isn't the end-all be-all of what's presented to the IJ, right? That's a chance to sort of hone in on important points, try to be persuasive, try to get a ruling in your favor, but did the application mention the Spanish language difficulty? So when the petitioners were testifying, they did state at AR-150, when Mr. Hernandez was testifying, he did state at AR-152 that Israel doesn't speak much Spanish, just basic words like hello, and that's it. And then he also said that because he doesn't speak Spanish, the other kids in Mexico may bully him. But then again, if you look at the record, Mr. Hernandez also said that Israel does understand some of the language. And when Ms. Perez testified, she said that with regard to Spanish language, she's afraid because of the crime in Mexico, and he doesn't speak the language. So there's that, and the closing argument, although it's not the entire record, it's the petitioner's opportunity to present their best case for why their case should be granted. And again, we are looking at this under the substantial evidence standard. With regard to what Petitioner's Counselor just said about education in Mexico, whether it would include teaching Israel Spanish, well, it's the petitioner's burden of proof to provide that evidence as to whether Israel will not get any Spanish language teachings. They have the burden to prove that they didn't submit that in the record. So based on all these factors, substantial evidence supports the agency's hardship determination. How old was Israel at the time of the hearing? At the time of the hearing, I believe he was 15, and I believe now he is 17 years old and a senior in high school, and he was on the standard track according to his individualized education plan. Can we talk about the timing issue? Sure, I'd be happy to, Your Honor. So, I mean, I'll, I guess I've confessed that I've come to the view that you probably have the better reading of the statute. Frankly, I think because of the Attorney General language, but Diaz uses some imprecise language, and I wonder what your response is to, like, the statement in Diaz that the text of the statute unambiguously requires that an alien have a qualifying relative when the immigration court finalizes its decision on the application for cancellation of removal. Now, it seems to me that's, like, pointing, that's sort of pointing in two different ways at the same time. One, the immigration court, I take to be a reference to the IJ, frankly. I guess you could extrapolate, and maybe that's the BIA as well, but then the word finalizes seems to me to point, like, toward the BIA because the immigration judge's decision isn't final until the BIA gets a hold of it, but then it circles back and says its decision, clearly a reference back to the immigration court. So, what do you make of that statement? So, I make of that statement the facts of that case. In Diaz or Llano, the qualifying relative aged out at the immigration court level, and that is why when this court discussed the age-out issue, it talked about immigration court, and that's what a lot of the cases that were cited in the 20th J letter by Petitioner's Counsel say, like, a lot of those cases were stated, as the immigration judge, because that's, those are the facts of the case, but Diaz or Llano also said that we look at the effect of removal on the listed relatives, depends on the state of the world at the time, at the time of removal. Okay, so good, good, good, good, good, good question. What does removal mean there? And for that matter, what does it mean in the statute? It surely does not mean when the person is on the plane being, you know, sort of throttling down the runway. What does removal mean? Removal means, you know, we don't just look at it in a vacuum. We look at the entire INA, and removal is defined in 1101A-47B, which is final order of removal, and the removal would be final either 30 days after the immigration judge's decision or when the board enters decision, and as Judge Newsom stated, the cancellation of removal application clearly says the Attorney General may, not the immigration judge, but the Attorney General. Okay, can I give you a, what I think is for me a concerning possibility, regardless of the way the statutory language works out? Let's assume that an IJ grants cancellation on hardship grounds, okay? Yes. Government appeals to the BIA. The child is 15 at the time of the IJ decision. Because of the backlog in immigration appeals to the BIA, the BIA doesn't rule until eight years later, and at that point it just says, eh, aged out, done, end of story. That's what you think happens under the statutory framework. So that seems like a harsh result. It is. So I'm just asking whether the statutory language demands it. The statutory language demands it because we're looking at the hardship to the child, to the qualifying relative, but by the time the person is aged out to 21, that person is no longer a child. That person, there are other avenues of relief. I know, but the delay is not because of anything that the petitioners did or any delay on the IJ's part. It's a delay on the BIA's part, and if that's the case, I'll give you a worse scenario, which is that the BIA decides to intentionally slow track cases in which the petitioners have won on hardship grounds. So we're going to fast track the ones on which petitioners have lost. We're going to slow track the ones on petitioners have won, and we'll just age them out, and then there's no review and there's nothing because there's one child and he's aged out. So that seems problematic, but... Let me tell you why, to me, it's a real concern. The statute may require that result because the press is all full of reports that immigration, that BIA judges are getting fired left and right for decisions which are seen as too immigrant-friendly, and so that hypothetical and that parade of horribles doesn't seem to be, like, too far removed from what we may see in the future. As caseloads go up and pressures go up and you have less immigration judges and more pressure on them to rule in favor of the government, that's a real distinct possibility in my mind. That would be alarming, but if that was the case of the board slow tracking these cases on purpose, I believe in those instances the petitioners could file a due process challenge, which was done in the Tenth Circuit case petitioners counsel cited in their opening brief, Martinez-Perez, which is a Tenth Circuit case from 2020, where the immigration judge is the one that caused the delay. And who decides the due process issue if he's aged out? The petition for review at the circuit court level, your honors. Right, so the BIA can't decide a due process issue, right? That is correct. It would be decided, as in a lot of immigration cases, at the courts of appeals. Okay, so here the delay is 3.5 years. That is correct. Is that a due process problem? I do not believe so. Where's the line? I don't know if there's a line. That would be done on an individual case-by-case basis, and that would be a determination to be made by the courts. This is not a criticism, but you understand why that answer is just unsatisfactory. And can I tell... I don't want to put you in a position of speaking for the entire Department of Justice. That would be unfair. But saying that three and a half years is not enough, but saying you don't know where the line is for age out on a due process issue, just doesn't help at all. Your honor... Because you're saying there's a due process claim somewhere, but you're not able to acknowledge where that due process violation might or might not exist? I cannot, your honor, speak on that issue. How long was the delay in the Tenth Circuit case? I believe the judge... I'm not exactly sure how long the delay was, but the immigration judge extended the case five times, and in that case, the petitioner specifically filed a motion to expedite saying that their child was going to age out. And that's what petitioners can do in certain cases to say, like in this case, if they thought that the hardship to Kevin should have been considered, then they could have filed the motion to expedite. It was not done in this case. And again, I would like to remind the court, the petitioners never said that there was a hardship to their son, Kevin. The only thing they said about Kevin was his name and date of birth. But that goes to the harmless error issue, potentially, but that doesn't go to the question of whether or not he's aged out statutorily or otherwise. And can I just say one more thing about this? Cancellation of removal is a continuing application, which means it cuts both ways. If, let's say, a petitioner marries or has a child, as the court stated in Diaz-Rihano, then that petitioner now has qualifying relatives. And would it make—it doesn't make sense that Congress would have written the cancellation of removal statute in the way that it did to allow a petitioner to have been married to a U.S. citizen, have a U.S. citizen's stepchild, at the time of the immigration court hearing, and seek cancellation of removal. And then while that appeal is pending at the board, he divorces, so he no longer has those qualifying relatives. So does it make sense that the agency must continue to consider a hardship to non-existent qualifying relatives? That does not make common sense. And I would like to say that with regard to Perez-Perez, the Sixth Circuit case, I just want to note that there—it was a split decision, and that case did not grapple with the attorney general language in cancellation of removal, nor did it consider the term final order of removal. And I believe that this court's reading in Diaz-Rihano, as affirmed by this court in PINA in April of 2025, is the right reading of the cancellation of removal statute. So can I ask you one question? The Tenth Circuit case that you were discussing with Judge Jordan, the delay there, that was a delay between IJ and BIA, or before IJ? The IJ. The IJ completely created the—it was— The delay. The delay, yes. So I guess what I'm asking is, this problem, which I agree, it's very unseemly and concerning, but this problem of delay exists not solely between the IJ and the BIA, but also before the IJs. And I guess Diaz sort of grappled with that. That is correct, Your Honor. You said, sort of, you kind of—it kind of cuts both ways. There's some unfairness on the back end, but maybe some lanyard on the front end. Right. And that's the way Congress wrote it. It's, you know, as the court—as the court acknowledged in Diaz-Rihano, the Congress knows how to freeze time and place. It did in the Child Status Protection Act. It did not do so for cancellation of removal. For those reasons, respondent asks that the court dismiss the petition for review in part, insofar as they challenge factual findings or to the weighing of those findings, and just—I'm sorry—deny the remainder of the petition for review. Thank you very much, Your Honors. Now I'm confused. You get review for substantial evidence, right? That's correct. Not dismissal. You didn't— If you think that there's substantial evidence supporting the hardship denial. Yes. You deny the petition. You don't dismiss the petition, right? You dismiss— that is correct, Your Honor. I apologize if I misspoke. You dismiss the petition if they only challenge factual findings or the weighing of those factual findings. But if you think that we have, you know, they're not challenging factual findings and we're just looking at the facts that the agency found to see if it meets the standard, then, of course, we would look at substantial evidence. I apologize if I misspoke. No, no. I understand. Thank you very much. Thank you so much for your time. Just a few quick points, Your Honors. In divorce or death, if a qualifying relative ceases to exist, there would be a candor to the court that would require the attorney to advise that that qualifying relative no longer exists. But how is that different just from the march of time? I mean, there's a judicially noticeable fact that someone died. There's a judicially noticeable fact that someone turned 21. I don't really understand how there's a difference between those two things. Well, a divorce would be something chosen by the person to end that relationship. I think the statute is talking about the protection of the child and that the child is still in existence. I understand that he's turned 21, but the hardship was still crystallized at the time that the IJ made the factual determinations. And we're also not asking the situation where, if you were to say, here's the conditions on the ground at the time, here's the hardship factors during my adjudication of the decision, but, oh, if we're gonna file an appeal, I have to make predictive factual findings in six, seven, eight years on how the kid will be at that point when the board adjudicates. I think it's, in that type of case, it's the person would have, have like a reasonable expectation that if the claim was decided on a certain group of individuals' children, then that would continue throughout. Can I ask you one sort of case-specific question? Yes, this is a little sus, that Kevin aged out a week before the board made its decision. Is it any part of your presentation in this case that the board waited on purpose so that Kevin would age out? I can't know for sure. I will just say in Arvielo-Vargas, the board's published decision, that case was a seven-year delay and the IJ granted, I case, and their first paragraph and two sentences was, oh, they aged out. So I can't say whether the eight days that occurred between his 21st birthday and the decision was purposeful, but it raises eyebrows, sure. All right, thank you both very much. Thank you, Your Honors. Okay, we finish up with something easy, some